**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DEBORAH JACKSON, VAN HANTE, | ) | |
| TERESSA DEAN, and CHRISTINE SHAW, | ) | |
| and a class of those similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No.     09-CV-04189 |
| | ) | |
| THE PAYDAY LOAN STORE OF ILLINOIS, | ) | |
| INC., d/b/a PAY DAY LOAN STORE, | ) | Judge Kendall |
| | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF MOTION TO COMPEL
ARBITRATION OF PLAINTIFFS' CLAIMS AND STAY PROCEEDINGS**

Defendant, Payday Loan Store of Illinois, Inc. d/b/a Payday Loan Store, incorrectly sued as

The Payday Loan Store of Illinois, Inc. d/b/a Pay Day Loan Store ("Defendant"), by its attorneys,

respectfully submits this reply memorandum in support of Defendant's Motion to Compel

Arbitration of Plaintiffs' Claims and Stay Proceedings.

**I.      INTRODUCTION AND BACKGROUND.**

Defendant seeks an order staying this consolidated action and requiring each Plaintiff to

pursue through individual arbitration any claim in Plaintiffs' Consolidated Class Action Complaint.

Plaintiff Deborah Jackson's lawsuit, originally filed as an individual action in the Circuit Court of

Cook County, Illinois, was properly removed to federal court.  Defendant filed a motion to compel

arbitration of her claims and stay the proceedings.  Subsequent to the removal of Plaintiff Jackson's

action, Plaintiff Van Hante filed in federal court a putative class-action complaint.  Then, Plaintiff

Teressa Dean and Plaintiff Christine Shaw filed individual actions in the Circuit Court of Cook

County, Illinois, and both cases were properly removed to federal court.  This Court granted

Defendant's agreed motions for reassignment of the related Hante, Dean, and Shaw actions (which

were pending before other judges), linking those actions with the lower-numbered Jackson action before this Court.  At the last court appearance (on September 16, 2009), this Court ordered Plaintiffs to file a consolidated complaint, had Defendant stand on its pending motion to compel arbitration and stay proceedings (filed in the Jackson lawsuit), and set a briefing schedule on Defendant's motion to compel arbitration, starting with Plaintiffs' response memorandum.  Despite this Court's instructions, Plaintiffs' counsel has filed a response to Defendant's motion to compel arbitration apparently limited to Plaintiff Jackson (labeling the response to the motion to compel as "Plaintiff Jackson's Response").  Defendant's pending motion should be granted as to all Plaintiffs. Plaintiffs' counsel should not be permitted multiple bites at the apple to argue for denial of Defendant's motion.

Plaintiffs' response memorandum is telling in its breadth.  Plaintiffs do not dispute that there is a written agreement to arbitrate, executed by each Plaintiff, that encompasses Plaintiffs' respective claims against Defendant.  Plaintiffs' opposition is limited to one point, and only one point -- that arbitration is "impossible."  Plaintiffs' "impossibility" arguments are based upon incorrect facts and erroneous legal arguments which provide no basis for denying Defendant's motion to compel the individual arbitration of Plaintiffs' claims.  Plaintiffs' attempt to avoid the Federal Arbitration Act and the strong national policy favoring arbitration falls short.  Defendant's motion should be granted, and each Plaintiff should be required to pursue through individual arbitration any claim in the Consolidated Complaint.

## II.    PLAINTIFFS' CLAIM THAT ARBITRATION IS IMPOSSIBLE IS BOTH INCORRECT AND PREMATURE.

Plaintiffs assert that arbitration is "impossible" because the Arbitration provision ("Arbitration Agreement") in each Plaintiff's Consumer Loan Agreement ("Loan Agreement") with Defendant refers to three arbitration organizations -- the National Arbitration Forum (NAF), the American Arbitration Association (AAA) and JAMS/Endispute -- and, per Plaintiffs' rhetoric, none

of the named arbitration organizations will administer the arbitration of Plaintiffs' respective

disputes with Defendant.  While Plaintiffs correctly point out that the NAF has ceased to administer

all consumer arbitrations, Plaintiffs "impossibility" arguments regarding the AAA and JAMS should

be rejected.  As Defendant explains below, contrary to Plaintiffs' assertions, the AAA continues to

administer arbitrations involving consumer disputes against businesses and the AAA will administer

the arbitration of Plaintiffs' respective disputes against Defendant.  Plaintiffs' projection that the

AAA and JAMS will not administer the arbitration of Plaintiffs' disputes because the Arbitration

Agreement lacks an express "small claims" carve-out is unsound.  More significantly, Plaintiffs'

projection (and request that this Court make a declaration that the Arbitration Agreement is void for

this reason) is premature.  Plaintiffs' arguments provide no basis to deny Defendant's motion to

compel arbitration.

> ### A.    The AAA Will Administer The Arbitration Of Plaintiffs' Disputes.

Plaintiffs' contention that their respective disputes cannot be arbitrated before the AAA

because the AAA has "imposed a moratorium" and has stopped administering consumer

arbitrations is flat-out wrong.  The AAA put a moratorium on handling "consumer debt collection

arbitrations" in which "the company is the filing party" in order to ensure that such arbitrations

were being handled fairly.  However, the AAA has made clear that it will continue to administer

arbitrations involving consumer disputes, including disputes of the type raised by Plaintiffs in their

Consolidated Complaint here.  In a Notice posted on its website, the AAA explained:

> **Notice on Consumer Debt Collection Arbitrations**
>
> Based on recent public discourse evaluation of our case experience, the American
> Arbitration Association has determined not to accept new <u>consumer debt collection
> arbitration filings as described below</u> effective immediately.
>
> Matters included in this moratorium are: <u>consumer debt collections</u> programs or
> bulk filings and individual case filings <u>in which the company is the filing party</u> and
> the consumer has not agreed to arbitrate at the time of the dispute and the case

involves a credit card bill or, the case involves a telecom bill or the case involves a consumer finance matter.

> The AAA will continue to administer all demands for arbitration filed by consumers against businesses, and all other types of consumer arbitrations.

AAA (www.adr.org), "Notice on Debt Collection Arbitrations" (emphasis added). Plaintiffs attached this Notice as Exhibit O to the Consolidated Complaint (and to their Response), but Plaintiffs have ignored its directive.

The AAA incontrovertibly will administer the arbitration of Plaintiffs' disputes asserted in the Consolidated Complaint because the arbitration would not be a "consumer debt collection arbitration … in which the company is the filing party." Defendant has filed a motion to compel the individual arbitration of each Plaintiff's TILA and Interest Act claims on an individual basis. If the motion to compel arbitration is granted, each Plaintiff will be required to initiate an arbitration if he or she wishes to pursue any claim in the Consolidated Complaint.

Notwithstanding the AAA's confirmation that it will continue to administer the arbitration of consumer disputes filed by consumers against businesses, Plaintiffs assert that arbitration is impossible because Defendant would be "the filing party" for arbitration and Plaintiffs do not want arbitration. See Response at p. 3. Plaintiffs err. The AAA will arbitrate Plaintiffs' respective disputes if Plaintiffs wish to pursue them. The claims in the Consolidated Complaint are Plaintiffs' disputes against Defendant; they are consumer disputes against a business. Defendant has not asserted any claims against any Plaintiff. The fact that Defendant "elected arbitration," and seeks to compel each Plaintiff to arbitrate any claim in the Consolidate Complaint that he or she wishes to pursue, does not make Defendant the claimant in arbitration or "the filing party." Plaintiffs' convenient view of the filing party is contradicted by Seventh Circuit law. In James v. McDonald's Corp., 417 F.3d 672 (7th Cir. 2005), the Court affirmed the district court's order dismissing the plaintiff's action for want of prosecution after the district court entered an order compelling the

4

plaintiff to arbitrate her claims and the plaintiff failed to pursue her claims in arbitration.  Id. at 675-76, 681.  As the Court explained, once the district court granted the defendant's motion and concluded that the plaintiff was required to arbitrate her claims, it was "incumbent upon [the plaintiff] to abide by the district court's ruling," and pursue her claims through arbitration.  Id. at 681.  Because the plaintiff failed to do so, the district court properly dismissed her claims with prejudice for want of prosecution.  Id.  Likewise here, the fact that Defendant filed a motion to compel arbitration and stay proceedings would not make Defendant the claimant or the filing party in arbitration.  Defendant seeks an order requiring each Plaintiff to pursue through arbitration any claim that he or she wishes to pursue.  If, after entry of such an order, Plaintiffs elect not to prosecute their claims in arbitration, then Plaintiffs' claims wither.  The Court could later dismiss the present action for Plaintiffs' failure to pursue their claim in arbitration.

This matter is not subject to the AAA's moratorium against accepting debt collection arbitrations in which the company is the filing party.  Notably, the AAA has emphasized that it is continuing to administer all consumer arbitrations other than debt collection actions in which the company is the filing party.  Indeed, as the President of the AAA has explained:

> [A]n important distinction should be made between consumer debt collection caseloads that are filed in large numbers almost exclusively by a single business claimant on the one hand, and individual consumer arbitrations on the other.  In connection with individual consumer arbitration filings, it is the view of the AAA that considerable success has been achieved in creating an arbitral forum that is accessible and fair to consumers.  More specifically, the Searle Civil Justice Institute at Northwestern University recently completed an in depth examination of consumer arbitrations administered by the AAA that found that consumer arbitration is an inexpensive and quick way to resolve consumer disputes, that the "repeat-player" effect was not statistically significant, and that attorney's fees are granted to consumers in the majority of cases where the consumer sought such an award.

Letter from the President of the AAA to the Minnesota Attorney General, July 2009, p. 2 (attached hereto as Exhibit 1).  Plaintiffs' claim of impossibility is simply wrong, and provides no basis to deny Defendant's motion to compel arbitration.

**B.** **Plaintiffs' Contention That The Arbitration Agreement Does Not Meet The Arbitrator's Due Process Standards Should Be Rejected.**

Plaintiffs' arguments that arbitration is impossible because the Arbitration Agreement violates the AAA and JAMS minimum due process standards ring hollow, and provide no basis to deny Defendant's motion to compel arbitration. Plaintiffs cite to Principal 1 of the AAA's Due Process Protocols, requiring that the arbitration process be "fundamentally fair," and to commentary by the AAA stating that the articulated principles are necessary because arbitration provisions in most contracts are offered on a "take-it-or-leave-it" basis. See Response at p. 4. However, contrary to Plaintiffs' suggestions, the Arbitration Agreement here was not offered on a "take-it-or-leave-it" basis. The Arbitration Agreement contains an opt-out provision allowing the borrower to reject the Arbitration Agreement, and stating: "If you do not want to be bound by this arbitration agreement, you may send a letter postmarked no later than the fifth business day after the date of this Agreement to Payday Loan Store…. The letter must include your name, address, date of this Agreement and a statement that you reject the arbitration agreement." Consolidated Complaint at Exhibits A, C, E, F, G, J, L. None of the Plaintiffs rejected the Arbitration Agreement.

Next, Plaintiffs cite to Principle 5 of the AAA's Consumer Due Process Protocol, stating that arbitration agreements should contain a "small claims" carve-out where the parties retain the right to seek relief in a small claims court for disputes or claims within the scope of the jurisdiction. See Response at p. 4. Plaintiffs' clamor about the right to small-claims procedures ignores that Plaintiffs claims are not typical "small claims" fare. The Illinois state-court small claims procedures "'were designed to allow pro se litigants to obtain resolution of disputes in a quick, simple, and informal manner unbridled by the technicalities and legal niceties which normally obtain in court proceedings.'" Tannenbaum v. Fleming, 234 Ill. App. 3d 1041, 1044 (2d Dist. 1992) (quoting Darwin Co. v. Sweeney, 110 Ill. App. 3d 331, 334 (4th Dist. 1982)). Here, Plaintiffs allege violations of the federal Truth in Lending Act, which claims are properly removable to federal court, which has

no small-claims procedures.  Moreover, the forms of proof for Plaintiffs claims do not lend themselves to "small claims" procedures.  The thrust of Plaintiffs' claims is that the annual percentage rate ("APR") disclosed in the Loan Agreement is incorrect in an amount in excess of the applicable tolerance.  There are a variety of methods of calculation permitted in the determination of the APR: the actuarial method; the U.S. Rule, and the Federal Reserve Board's Annual Percentage Rate Table.  See 15 U.S.C. § 1606; 12 C.F.R. § 226.22; 12 C.F.R. § 226, App. J.  The methods of calculation are complicated and technical as evidence by Appendix J to Regulation Z (attached as Exhibit 2 hereto).  As the National Consumer Law Center, a noted consumer oracle, has recognized:

> Given the variety of methods and tolerances, there is often no simple way to determine if a creditor has committed a violation.  If a calculation shows an annual percentage rate the same as that disclosed or within the acceptable tolerance, there is no violation.  If the annual percentage rate differs by more than the allowed tolerance from the disclosed rates there may be a violation, but it is possible that another acceptable calculation method was used.  Consequently, where a violation is suspected, it is usually necessary to explore all the calculations methods and assumptions permitted for a particular transaction to determine that none of them produce an annual percentage rate within the tolerance level of the rate disclosed.

National Consumer Law Center, Truth in Lending (5th Ed. 2003), § 4.6.4.1.  APR calculations involve formulas, and computer programs and software, and the evidence necessary for the claims and defenses may realistically include expert witnesses.

Plaintiffs' "small claims" argument also ignores the attorney's fees component of their claims.  Given the complex nature of the claims and proofs, if Plaintiffs succeed, the attorney's fees Plaintiffs seek will assuredly be in excess of the $10,000 small claims amount.  In addition, the Hante complaint was designed as a federal-court action and there are no "small claims" procedures.  Moreover, Plaintiffs' Consolidated Complaint includes class claims and a count for declaratory and injunctive relief, which are not small-claims court matters.  See Circuit Court of Cook County, Illinois, General Order 1.2, Section 2.1(b)(1) ("The General Chancery Section hears actions and

proceedings, regardless of the amount of claim, <u>concerning class actions</u>, mortgage foreclosures, arbitrations, <u>injunctions</u>, temporary restraining orders . . . <u>declaratory judgments</u>, …").

Further, it should not be taken as a given (simply because Plaintiffs say it is so) that the purported lack of this one recommended feature, an express "small claims" carve-out, in the Arbitration Agreement makes the Agreement not substantially and materially in compliance with the Protocol. As the AAA explains:

> If the Association determines that... a dispute resolution clause on its face, <u>substantially and materially</u> deviates from the minimum due process standards of this Protocol, the Association <u>may</u> decline to administer cases arising under this clause. <u>As this area of the law is still developing, issues that are not clearly substantial and material deviations will be presented to the arbitrator for determination.</u>

AAA, Rules Updates, Consumer Arbitrations: Notice to Consumers and Businesses (*available at* [www.adr.org](www.adr.org)) (emphasis added).

For the same reasons, Plaintiffs argument that arbitration is impossible because the Arbitration Agreement does not comport with the minimum due process standards of JAMS, <u>see</u> Response at p. 5, should also be rejected.

Plaintiffs' request for a declaration that the Arbitration Agreement is ineffective and unenforceable because neither the AAA nor JAMS will administer an arbitration of Plaintiffs' respective disputes is undeniably premature. None of the Plaintiffs have attempted to submit a dispute to the AAA, or to JAMS. Plaintiffs' request for a declaration concerning the validity of the Arbitration Agreement is premature and seeks an impermissible advisory opinion from this Court.

Plainly, the determinations whether the Arbitration Agreement is substantially and materially non-compliant with an arbitration organization's minimum due process standards, and whether the AAA and JAMS will, in fact, refuse arbitration, should be made by those arbitration organizations. The AAA has acknowledged as much, explaining that an initial review should be made by the

Association, and that issues that are not "clearly substantial and material deviations" will be referred to the arbitrator.[1]

The case law confirms that questions regarding alleged non-compliance with an arbitration organization's due process protocols should be adjudicated by the arbitrator.  See Ragan v. AT&T Corp., 355 Ill. App. 3d 1143, 1156-57 (5th Dist. 2005) (rejecting plaintiff's claim that arbitration was impossible because the AAA will refuse to arbitrate because the arbitration agreement fails to meet the AAA's Due Process Protocol; and compelling arbitration).  In Ragan, the court explained that "it is for the arbitrator to construe the [arbitration agreement]."  Id. at 1157.  The court further explained:  "If the AAA refused to arbitrate this dispute because of the terms of the [arbitration agreement], then the matter can be referred back to the trial court.  We are staying the matter, not dismissing it."  Id.  Here, Defendant is seeking to compel arbitration and to stay (not dismiss) the proceedings.  Case law demands that this Court enter an order compelling Plaintiffs to submit their claims to arbitration.  None of Plaintiffs' arguments support avoiding this necessary step.

## III.    IF THE NAMED ARBITRATORS DO, IN FACT, REFUSE TO ADMINISTER THE ARBITRATION, THIS COURT MAY THEN DETERMINE WHETHER ARBITRATION SHOULD PROCEED BEFORE A SUBSTITUTE ARBITRATOR.

The alleged failure of the arbitration forums referenced in the Arbitration Agreement (by their hypothetical refusal to arbitrate Plaintiffs' claims) does not void the Agreement.  Section 5 of the FAA authorizes judicial appointment of arbitrators, and was drafted to provide a solution to the problem caused when the arbitrator selected cannot or will not perform.  See 9 U.S.C. § 5.  Section 5 provides:

> If in the agreement provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be followed; but if no

---

[1] In addition, the parties' Arbitration Agreement provides that disputes subject to arbitration include "the validity of this arbitration provision."  As the Seventh Circuit has recognized, "the parties to a contract can if they wish assign the determination of arbitrability of a dispute to an arbitrator."  Air Line Pilots Ass'n Int'l v. Midwest Express Airlines, Inc., 279 F.3d 553, 555 (7th Cir. 2002).

method be provided therein, or if a method be provided and any party thereto shall fail to avail himself of such method, <u>or if for any other reason there shall be a lapse in the naming of an arbitrator</u> or arbitrators or umpire, <u>or in filling a vacancy,</u> <u>then</u> upon the application of either party to the controversy <u>the court shall designate and appoint an arbitrator</u> or arbitrators or umpire, as the case may require, who shall act under the said agreement <u>with the same force and effect as if he or they had been specifically named therein;</u> and unless otherwise provided in the agreement the arbitration shall be by a single arbitrator.  <u>Id</u>. (emphasis added).

 "[A]s as a general rule, where the arbitrator named in the arbitration agreement cannot or will not arbitrate the dispute, a court does not void the agreement, but, instead appoints a different arbitrator."  <u>McGuire, Cornwell & Blakely v. Grider</u>, 771 F. Supp. 319, 320 (D. Colo. 1991).  Applying Section 5, courts have repeatedly rejected claims that arbitration is impossible because the designated arbitrator cannot or will not arbitrate the dispute.  <u>See</u>, <u>e.g.</u>, <u>Brown v. ITT Consumer Fin. Corp.</u>, 211 F.3d 1217, 1222 (11th Cir. 2000) (rejecting argument that arbitration agreement is void because the specified forum, the National Arbitration Forum (NAF), had dissolved; and explaining that Section 5 of the FAA provides the necessary remedy for naming a replacement arbitrator where, for any reason, there is a lapse in the naming of an arbitrator); <u>Astra Footwear Indus. v. Harwyn Int'l, Inc.</u>, 442 F. Supp. 907, 910-11 (S.D.N.Y. 1978) (compelling arbitration, and holding that where designated arbitrator ceased to arbitrate disputes, the court would appoint an arbitrator, pursuant to Section 5 of the FAA, should the parties fail to agree upon one substitute arbitrator); <u>Hawaii Teamsters & Allied Workers, Local 996 v. Honolulu Rapid Transit Co.</u>, 343 F. Supp. 419, 425 (D. Haw. 1972) (rejecting contention that arbitration should be denied on the basis of impossibility of following the procedure for designating the arbitrator).  Similarly, in <u>Zechman v. Merrill Lynch, Pierce, Fenner & Smith</u>, 742 F. Supp. 1359, 1364-66 (N.D. Ill. 1990), the court compelled arbitration before a neutral arbitrator in a case where the parties' agreement provided that their disputes be arbitrated in accordance with the regulations of the Chicago Board of Trade (CBOT), and CBOT refused jurisdiction.  The court explained, "we simply cannot conclude that the parties intent [to

arbitrate] would be frustrated by an arbitration proceeding that excludes the active participation by CBOT." Id. at 1366.

Plaintiffs rely on In re Salomon Inc. Shareholders' Derivative Litigation, 68 F.3d 554 (2d Cir. 1995), for the proposition that a party cannot be compelled to arbitrate before someone other than the arbitrators named in the Arbitration Agreement. See Response at p. 6. This reliance is misplaced. In re Salomon Inc. is the minority view, and ignores the "general rule" that where the arbitrator named in the arbitration agreement cannot or will not arbitrate the dispute, a court does not void the agreement, but, instead appoints a different arbitrator. See, e.g., Brown, 211 F.3d at 1222 (rejecting argument that arbitration agreement is void because the specified forum, the National Arbitration Forum (NAF), had dissolved; and explaining that Section 5 of the FAA provides the necessary remedy for naming a replacement arbitrator where, for any reason, there is a lapse in the naming of an arbitrator). In re Salomon Inc. is also distinguishable on its facts. There, as the court recognized, the arbitration agreement provided that "all disputes were to be arbitrated by the NYSE [New York Stock Exchange] and only the NYSE, 'in accordance with the [NYSE] Constitution and Rules." 68 F.3d at 557. The exclusive choice of a self-regulatory organization as the sole arbitral forum, with its specific rules, was an integral part of the parties' agreement.

Conversely, here, the Arbitration Agreement identified the three most well-known arbitration organizations, stated that the arbitration would proceed in accordance with the rules of the applicable arbitration organization in effect at the time that the arbitration claim is filed. See Arbitration Agreement. Plaintiffs do not argue, and have made no showing, that the choice of arbitrators was central to the parties' agreement to arbitrate and that the parties intended that the Arbitration Agreement would be voided if the named entities could not administer the arbitration. Indeed, the language of both the Loan Agreement and the Arbitration Agreement belies any such argument. In the Loan Agreement, just above Plaintiffs' respective signatures, it explains that

11

Plaintiffs, "by signing" the Agreement, expressly acknowledge that Plaintiffs have "read, understand, and agree" to the terms of the Loan Agreement, <u>including</u> the terms of the Arbitration Agreement. <u>See</u> Loan Agreement.  And the Arbitration Agreement provides:

> If any part of this provision or application of this provision to any particular Claim or subject matter is held to be invalid or unenforceable, the remainder of this arbitration provision and the application of this provision to any other Claims will remain valid and enforceable.  In the event of a conflict between the arbitration organization's code and this provision, this provision controls.

<u>See</u> Arbitration Agreement.  The parties' clear intent to arbitrate would not be frustrated by an arbitration that did not include the active participation of the NAF, the AAA, or JAMS.

Moreover, as Defendant explained in its opening supporting memorandum, there is a strong federal policy to liberally construe arbitration agreements and to resolve any doubts in favor of arbitration.  As the United States Supreme Court has repeatedly explained, the FAA "'declare[s] a national policy favoring arbitration' of claims that parties contract to settle in that manner." <u>Preston v. Ferrer</u>, __ U.S. __, 128 S. Ct. 978, 983 (2008) (quoting <u>Southland</u>, 465 U.S. at 10).  Indeed, the purpose of the FAA is "to reverse the longstanding judicial hostility to arbitration agreements . . . and to place arbitration agreements upon the same footing as other contracts." <u>Gilmer v. Interstate/Johnson Lane Corp.</u>, 500 US. 20, 24 (1991).

Thus, if, down the road, Plaintiffs do in fact pursue arbitration with the AAA and JAMS, and the AAA and JAMS do in fact evaluate Plaintiffs' dispute and the parties' Arbitration Agreement, and the AAA and JAMS do in fact refuse to administer the arbitration, this matter may then be brought back to this Court for a determination whether arbitration should be enforced and pursued before a substitute arbitrator.  <u>See</u> <u>Ragan</u>, 355 Ill. App. 3d at 1156-57 ("If the AAA refuse[s] to arbitrate this dispute … then the matter can be referred back to the trial court. We are staying the matter, not dismissing it.").  Defendant's motion should be granted, and Plaintiffs should be compelled to submit their claims to arbitration rather than arguing hypotheticals.

## IV.   PLAINTIFFS MUST ARBITRATE THEIR RESPECTIVE CLAIMS ON AN INDIVIDUAL BASIS.

The Arbitration Agreement requires each Plaintiff to arbitrate his claims on an individual

(non-class) basis.  The Arbitration Agreement expressly provides:

> If we or you choose arbitration, we and you no longer have the right to go to court
> or to have a jury trial except for any right of appeal provided by the Federal
> Arbitration Act.  <u>If arbitration is chosen, you do not have the right to have any claim
> arbitrated as a class action.  No joinder or consolidation of parties, except for joinder
> of parties to the same loan agreement, will be permitted in any arbitration.</u>

Arbitration Agreement (emphasis added).  The Arbitration Agreement further provides:

> READ THIS AGREEMENT CAREFULLY, IT LIMITS CERTAIN RIGHTS,
> INCLUDING YOUR RIGHT TO PURSUE A CLAIM IN COURT AND YOUR
> RIGHT TO A JURY TRIAL AND YOUR RIGHT TO PURSUE A CLAIM AS A
> CLASS ACTION.

<u>Id.</u> (emphasis in original).

Plaintiffs fail to argue in their opposition to Defendant's motion that the class-action waiver

contained in the parties' Arbitration Agreement is unenforceable because the class action waiver is

"unconscionable."  Although Plaintiffs included a cursory allegation that the class-action waiver was

"unconscionable" (citing to <u>Kinkel v. Cingular Wireless LLC</u>, 223 Ill. 2d 1 (2006)) in Count III of

the Consolidated Complaint, Plaintiffs have recoiled from this point and waived opposition on this

ground.  And for good reason.  Plaintiffs' allegation that a class-action waiver is unconscionable runs

counter to the law of the Seventh Circuit, which has consistently enforced individual arbitration

provisions (class-action waivers) such as the one here.  In <u>Livingston v. Associates Financial, Inc.</u>,

339 F.3d 553 (7th Cir. 2003), the Court reversed the district court's orders denying the motion to

compel arbitration and certifying a class action, and stated, "The Arbitration Agreement at issue here

explicitly precludes the Livingstons from bringing class claims or pursuing 'class action arbitration,'

so we are therefore 'obligated to enforce the type of arbitration to which these parties agreed, which

does not include arbitration on a class-basis.'"  <u>Id.</u> at 559 (citing <u>Champ v. Siegel Trading Co.</u>, 55

F.3d 269, 277 (7th Cir. 1995)); see also Carbajal v. H&R Block Tax Serv., Inc., 372 F.3d 903, 904

(7th Cir. 2004) (affirming order compelling arbitration where arbitration agreement did not permit

class actions without the parties' consent); James, 417 F.3d at 681 (affirming order compelling

arbitration where agreement provided that all claims "shall be resolved individually, without resort to

any form of class action").  The Arbitration Agreement here requires individual, rather than class-

wide, arbitration, and it should be enforced according to its terms.

What is more, even if Plaintiffs did raise an "unconscionability" argument (which they did

not), Plaintiffs' reliance on Kinkel is misplaced.  Kinkel did not hold that class-action waivers are *per*

*se* unconscionable.  To the contrary, the Illinois Supreme Court explained:

> A class action waiver will **not** be found unconscionable if the plaintiff had a
> meaningful opportunity to reject the contract term or if the agreement containing the
> waiver is not burdened by other features limiting the ability of plaintiff to obtain a
> remedy for the particular claim being asserted in a cost-effective manner.

Kinkel, 223 Ill. 2d at 41 (emphasis added).  Based on the facts here, the class action waiver is plainly

not unconscionable.

In conjunction with each of their individual loan transactions with Defendant, each Plaintiff

executed a Loan Agreement that contained an Arbitration Agreement that clearly and

unambiguously states that any claim, dispute, or controversy shall be resolved, upon election of

either party, by binding arbitration.  See Consolidated Complaint at Exhibits A, C, E, F, G, J, L.  The

Arbitration Agreement plainly requires each Plaintiff to arbitrate his or her claims on an individual

basis (rather than a class-wide basis).  See id.  The Arbitration Agreement contains an opt-out

provision allowing the borrower the unfettered right to reject the Arbitration Agreement, and states:

> If you do not want to be bound by this arbitration agreement, you may send a letter
> postmarked no later than the fifth business day after the date of this Agreement to
> Payday Loan Store…. The letter must include your name, address, date of this
> Agreement and a statement that you reject the arbitration.

Id.  Plaintiffs had a meaningful opportunity to reject arbitration and the class-action waiver. None of the Plaintiffs rejected the Arbitration Agreement.

In addition, the Arbitration Agreement does not in any way impede Plaintiffs from obtaining a remedy on their respective claims in a cost-efficient manner.  Having filed the Jackson, Dean, and Shaw complaints as individual actions, Plaintiffs' counsel concedes that Plaintiffs' claims can be pursued on an individual basis, without a class action.  Moreover, as set forth in the Arbitration Agreement, the arbitrator applies the relevant law, and the statutes upon which Plaintiffs base their claims -- TILA and the Illinois Interest Act -- provide substantial statutory damages and permit recovery of attorneys' fees and costs if Plaintiffs prevail.  See 15 U.S.C. §1640(a); 815 ILCS 205/6. Accordingly, each Plaintiff should be required to arbitrate on an individual basis any claim in the Consolidated Complaint that he or she wishes to pursue.

## IV.    CONCLUSION.

For the foregoing reasons, Defendant requests that this Court grant Defendant's motion, and enter an order requiring each Plaintiff to pursue through individual arbitration any claim in the Consolidated Class Action Complaint.  Defendant further requests that this Court stay the proceedings pending arbitration and grant such further relief as the Court deems appropriate.

Dated:  October 14, 2009

Respectfully submitted,

**PAYDAY LOAN STORE OF ILLINOIS, INC. d/b/a PAYDAY LOAN STORE**,

By:     s/Jonathan N. Ledsky
           One of Its Attorneys

Craig A. Varga
Jonathan N. Ledsky
Scott J. Helfand
Varga Berger Ledsky Hayes & Casey
A Professional Corporation
224 South Michigan Avenue, Suite 350
Chicago, Illinois  60604
(312) 341-9400

## <u>CERTIFICATE OF SERVICE</u>

Jonathan N. Ledsky, an attorney, hereby certifies that a true and correct copy of the

foregoing **Defendant's Reply Memorandum In Support Of Motion To Compel Arbitration Of**

**Plaintiffs' Claims And Stay Proceedings** was served electronically via CM/ECF e-Filing upon:

Daniel A. Edelman (courtecl@edcombs.com)
Cathleen M. Combs (ccombs@edcombs.com)
James O. Latturner (jlatturner@edcombs.com)
Thomas Everett Soule (tsoule@edcombs.com)

this 14th day of October, 2009.

s/ Jonathan N. Ledsky

# EXHIBIT 1

**American Arbitration Association**
*Dispute Resolution Services Worldwide*

Officers

*Chairperson of the Board*
John M. Townsend

*Chairperson of the*
*Executive Committee*
Jois M. Johnson

*President*
William K. Slate II

*Treasurer*
Francesco Rossi

*General Counsel and*
*Corporate Secretary*
Eric P. Tuchmann

July 20, 2009

1633 Broadway, Floor 10, New York, NY 10019-6708
telephone: 212 716 5880, facsimile: 212 716 5905
www.adr.org

Ms. Lori Swanson
Attorney General
State of Minnesota
1400 Bremer Tower
445 Minnesota Street
St. Paul, MN  55101

Dear Attorney General Swanson:

I have received your letter dated July 19, 2009 and would like to respond to the very important issues raised and concerns you have expressed about consumer debt arbitration programs.  Like you, the American Arbitration Association ("AAA") is deeply committed to providing access to justice for consumers, and we have worked with great dedication over the years to develop widely respected protocols, codes of ethics and other procedures to ensure that arbitrations administered under the auspices of the AAA are handled fairly and efficiently.

The AAA is unique with respect to our governance structure in that other ADR providers are almost exclusively organizations that operate for a profit, whereas the AAA is an 83 year old not-for-profit organization with a mission dedicated to developing the widespread, effective and ethical use of alternative dispute resolution. As part of our governance structure, we have a Board of Directors that provides divergent representative viewpoints of former judges, government and union officials, and the plaintiff and corporate bars.  Fortunately, the AAA is able to draw on those varied experiences, in addition to our own, in developing dispute resolution processes that accommodate the needs of parties not only for a cost effective and efficient method of resolving disputes, but more importantly dispute resolution processes that are fair and which accommodate the particular characteristics of the parties.

Regarding some of the specific points you have raised, I would like to first make you aware that the AAA is not currently administering any large debt collection programs of the type described in your letter, and in fact, the AAA has only administered one such program which ended in June of this year.  After the

Ms. Lori Swanson
Attorney General
State of Minnesota
July 20, 2009
Page 2

conclusion of the AAA's administration of that caseload, the AAA engaged in a
significant effort to identify and consider many of the aspects of debt collection
arbitration programs that give rise to legitimate concerns.

Those concerns include issues related to matters such as the notice that is
provided to consumers, arbitrator neutrality, the amount and type of evidence
that a business is required to submit when they file a demand for arbitration
against a consumer, and other matters such as a consumer's ability to defend an
arbitration in light of claims such as of identity theft.  You have also expressed
some thoughts about consumers' knowledge of the arbitration process and their
perceived ability to obtain access to the arbitral forum, which are concerns
shared by the AAA.

It is the AAA's view that each of these issues must be studied individually to
determine whether the arbitration process can be accommodated to address the
concerns raised.  An AAA representative will be presenting various ideas about
how it might be possible to do so at the July 22nd hearing of the Domestic Policy
Subcommittee of the House Committee on oversight and Government Reform.  I
understand that you will be a witness at that hearing as well and we look
forward to sharing our views in detail with you at that time.  In the meantime,
and until such that there is some consensus on how concerns about the
administration of debt collection arbitrations might be successfully addressed,
the AAA has implemented a moratorium on the administration of any consumer
debt collection arbitration programs.

However, I would also like to note that an important distinction should be made
between consumer debt collection caseloads that are filed in large numbers
almost exclusively by a single business claimant on the one hand, and individual
consumer arbitrations on the other.  In connection with individual consumer
arbitration filings, it is the view of the AAA that considerable success has been
achieved in creating an arbitral forum that is accessible and fair to consumers.
More specifically, the Searle Civil Justice Institute at Northwestern University
recently completed an in depth examination of consumer arbitrations
administered by the AAA that found that consumer arbitration is an inexpensive
and quick way to resolve consumer disputes, that the "repeat-player" effect was
not statistically significant, and that attorneys' fees are granted to consumers in
the majority of cases where the consumer sought such an award.

Ms. Lori Swanson
Attorney General
State of Minnesota
July 20, 2009
Page 3

In addition, the Searle Institute found that the AAA's fidelity to the Consumer
Due Process Protocol was effective in identifying and responding to consumer
arbitration agreements that did not meet the AAA's minimum standards of
fairness and due process. Finally, for consumer arbitrations other than debt
collection arbitrations administered by the AAA, the vast majority of cases (72%
of consumer cases filed with the AAA in 2008) are filed by the *consumer* party.
This evidence would suggest that AAA arbitration provides a meaningful
avenue for the resolution of consumer disputes. While the Searle study did not
investigate consumer debt arbitration caseloads which can fairly be viewed as a
subset of consumer arbitration, the Searle institute has now commenced a study
of consumer debt collection arbitrations which will also be informative with
respect to improvements that might be implemented into the arbitration process.

I hope that this letter adequately explains the AAA's current position and
practices with the administration of consumer and debt collection arbitrations.
To the extent that you have any additional questions or concerns, we would
welcome the opportunity to discuss it with you further.


Sincerely yours,

William K. Slate II

William K. Slate II

# EXHIBIT 2

Westlaw.

**Effective:[See Text Amendments]**

Code of Federal Regulations Currentness
   Title 12. Banks and Banking
      Chapter II. Federal Reserve System
         Subchapter A. Board of Governors of the Federal Reserve System
         Part 226. Truth in Lending (Regulation Z) (Refs & Annos)

→ **APPENDIX J TO PART 226–ANNUAL PERCENTAGE RATE COMPUTATIONS FOR CLOSED-END CREDIT TRANSACTIONS**

(a) Introduction

(1) Section 226.22(a) of Regulation Z provides that the annual percentage rate for other than open end credit transactions shall be determined in accordance with either the actuarial method or the United States Rule method. This appendix contains an explanation of the actuarial method as well as equations, instructions and examples of how this method applies to single advance and multiple advance transactions.

(2) Under the actuarial method, at the end of each unit-period (or fractional unit-period) the unpaid balance of the amount financed is increased by the finance charge earned during that period and is decreased by the total payment (if any) made at the end of that period. The determination of unit-periods and fractional unit-periods shall be consistent with the definitions and rules in paragraphs (b)(3), (4) and (5) of this section and the general equation in paragraph (b)(8) of this section.

(3) In contrast, under the United States Rule method, at the end of each payment period, the unpaid balance of the amount financed is increased by the finance charge earned during that payment period and is decreased by the payment made at the end of that payment period. If the payment is less than the finance charge earned, the adjustment of the unpaid balance of the amount financed is postponed until the end of the next payment period. If at that time the sum of the two payments is still less than the total earned finance charge for the two payment periods, the adjustment of the unpaid balance of the amount financed is postponed still another payment period, and so forth.

(b) Instructions and Equations for the Actuarial Method

(1) General Rule

The annual percentage rate shall be the nominal annual percentage rate determined by multiplying the unit-period rate by the number of unit-periods in a year.

(2) Term of the Transaction

The term of the transaction begins on the date of its consummation, except that if the finance charge or any portion of it is earned beginning on a later date, the term begins on the later date. The term ends on the date the last payment is due, except that if an advance is scheduled after that date, the term ends on the later date. For computation purposes, the length of the term shall be equal to the time interval between any point in time on the beginning date to the same point in time on the ending date.

(3) Definitions of Time Intervals

(i) A period is the interval of time between advances or between payments and includes the interval of time between the date the finance charge begins to be earned and the date of the first advance thereafter or the date of the first payment thereafter, as applicable.

(ii) A common period is any period that occurs more than once in a transaction.

(iii) A standard interval of time is a day, week, semi-month, month, or a multiple of a week or a month up to, but not exceeding, 1 year.

(iv) All months shall be considered equal. Full months

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

shall be measured from any point in time on a given date of a given month to the same point in time on the same date of another month. If a series of payments (or advances) is scheduled for the last day of each month, months shall be measured from the last day of the given month to the last day of another month. If payments (or advances) are scheduled for the 29th or 30th of each month, the last day of February shall be used when applicable.

(4) Unit-period

(i) In all transactions other than a single advance, single payment transaction, the unit-period shall be that common period, not to exceed 1 year, that occurs most frequently in the transaction, except that

(A) If 2 or more common periods occur with equal frequency, the smaller of such common periods shall be the unit-period; or

(B) If there is no common period in the transaction, the unit-period shall be that period which is the average of all periods rounded to the nearest whole standard interval of time. If the average is equally near 2 standard intervals of time, the lower shall be the unit-period.

(ii) In a single advance, single payment transaction, the unit-period shall be the term of the transaction, but shall not exceed 1 year.

(5) Number of Unit-periods Between 2 Given Dates

(i) The number of days between 2 dates shall be the number of 24-hour intervals between any point in time on the first date to the same point in time on the second date.

(ii) If the unit-period is a month, the number of full unit-periods between 2 dates shall be the number of months measured back from the later date. The remaining fraction of a unit-period shall be the number of days measured forward from the earlier date to the beginning of the first full unit-period, divided by 30. If the unit-period is a month, there are 12 unit-periods per year.

(iii) If the unit-period is a semimonth or a multiple of a

month not exceeding 11 months, the number of days between 2 dates shall be 30 times the number of full months measured back from the later date, plus the number of remaining days. The number of full unit-periods and the remaining fraction of a unit-period shall be determined by dividing such number of days by 15 in the case of a semimonthly unit-period or by the appropriate multiple of 30 in the case of a multimonthly unit-period. If the unit-period is a semimonth, the number of unit-periods per year shall be 24. If the number of unit-periods is a multiple of a month, the number of unit-periods per year shall be 12 divided by the number of months per unit-period.

(iv) If the unit-period is a day, a week, or a multiple of a week, the number of full unit-periods and the remaining fractions of a unit-period shall be determined by dividing the number of days between the 2 given dates by the number of days per unit-period. If the unit-period is a day, the number of unit-periods per year shall be 365. If the unit-period is a week or a multiple of a week, the number of unit-periods per year shall be 52 divided by the number of weeks per unit-period.

(v) If the unit-period is a year, the number of full unit-periods between 2 dates shall be the number of full years (each equal to 12 months) measured back from the later date. The remaining fraction of a unit-period shall be

(A) The remaining number of months divided by 12 if the remaining interval is equal to a whole number of months, or

(B) The remaining number of days divided by 365 if the remaining interval is not equal to a whole number of months.

(vi) In a single advance, single payment transaction in which the term is less than a year and is equal to a whole number of months, the number of unit-periods in the term shall be 1, and the number of unit-periods per year shall be 12 divided by the number of months in the term or 365 divided by the number of days in the term.

(vii) In a single advance, single payment transaction in

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

which the term is less than a year and is not equal to a whole number of months, the number of unit-periods in the term shall be 1, and the number of unit-periods per year shall be 365 divided by the number of days in the term.

(6) Percentage Rate for a Fraction of a Unit-period

The percentage rate of finance charge for a fraction (less than 1) of a unit-period shall be equal to such fraction multiplied by the percentage rate of finance charge per unit-period.

(7) <u>Symbols</u>. The symbols used to express the terms of a transaction in the equation set forth in paragraph (b)(8) of this section are defined as follows:

| | | |
|---|---|---|
| $A_k$ | = | The amount of the kth advance. |
| $q_k$ | = | The number of full unit-periods from the beginning of the term of the transaction to the kth advance. |
| $e_k$ | = | The fraction of a unit-period in the time interval from the beginning of the term of the transaction to the kth advance. |
| $m$ | = | The number of advances. |
| $P_i$ | = | The amount of the jth payment. |
| $t_j$ | = | The number of full unit-periods from the beginning of the term of the transaction to the jth payment. |
| $f_j$ | = | The fraction of a unit-period in the time interval from the beginning of the term of the transaction to the jth payment. |
| $n$ | = | The number of payments. |
| $i$ | = | The percentage rate of finance charge per unit-period, expressed as a decimal equivalent. |

Symbols used in the examples shown in this appendix are defined as follows:

| | | |
|---|---|---|
| ?sym? | = | The present value of 1 per unit-period for x unitperiods, first payment due immediately. |
| | = | $1 + 1/(1+i) + 1/(1+i)^2 + \ldots\ldots + 1/(1+i)^{(x-1)}$ |
| $w$ | = | The number of unit-periods per year. |
| $I$ | = | wi x 100 = The nominal annual percentage rate. |

(8) <u>General equation</u>. The following equation sets forth the relationship among the terms of a transaction:

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

$$[A_1/(1+e_1i)(1+i)^{q_1}] + [A_2/(1+e_2i)(1+i)^{q_2}] + \ldots + [A_m/(1+e_mi)(1+i)^{q_m}] = [P_1/(1+f_1i)(1+i)^{t_1}] + [P_2/(1+f_2i)(1+i)^{t_2}] + \ldots + [P_n/(1+f_ni)(1+i)^{t_n}]$$

(9) <u>Solution of general equation by iteration process.</u> (i) The general equation in paragraph (b)(8) of this section, when applied to a simple transaction in which a loan of $1000 is repaid by 36 monthly payments of $33.61 each, takes the special form:

$$A = 33.61 \ ?sym?/(1+i)$$

| | | |
|---|---|---:|
| Step 1: | Let $I_1$ = estimated annual percentage rate = | 12.50% |
| | Evaluate expression for A, letting i = $I_1$/(100w) = | .010416667 |
| | Result (referred to as A')= | 1004.674391 |
| Step 2: | Let $I_2$ = $I_1$ + .1 = | 12.60% |
| | Evaluate expression for A, letting i = $I_2$/(100w)= | .010500000 |
| | Result (referred to as A") = | 1003.235366 |
| Step 3: | Interpolate for I (annual percentage rate): | |
| | $I = I_1 + .1[(A-A')/(A''-A')]$ | |
| | = 12.50 + .1[(1000.000000 - 1004.674391)/(1003.235366 - 1004.674391)]= | 12.82483042 % |
| Step 4: | First iteration, let $I_1$ = 12.82483042 % and repeat | |
| | Steps 1, 2, and 3 obtaining a new I = | 12.82557859 % |
| | Second iteration, let $I_1$ = 12.82557859 % and repeat | |
| | Steps 1, 2, and 3 obtaining a new I = | 12.82557529 % |

In this case, no further iterations are required to obtain the annual percentage rate correct to two decimal places, 12.83%.

(ii) When the iteration approach is used, it is expected that calculators or computers will be programmed to carry all available decimals throughout the calculation and that enough iterations will be performed to make virtually certain that the annual percentage rate obtained, when rounded to 2 decimals, is correct. Annual percentage rates in the examples below were obtained by using a 10 digit programmable calculator and the iteration procedure described above.

(c) <u>Examples for the actuarial method.</u> (1) <u>Single advance transaction, with or without an odd first period, and otherwise regular.</u> The general equation in paragraph (b)(8) of this section can be put in the following special form for this type of transaction:

$$A=1/(1+fi)(1+i)^t(P \ ?sym?)$$

<u>Example</u> (i): Monthly payments (regular first period)

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Amount advanced (A) = $5000. Payment (P) = $230.
Number of payments (n) = 24.
Unit-period = 1 month. Unit-periods per year (w) = 12.
Advance, 1-10-78. First payment, 2-10-78.
From 1-10-78 through 2-10-78 = 1 unit-period. (t = 1; f=0)
Annual percentage rate (I) = wi = .0969 = 9.69%

Example (ii): Monthly payments (long first period)

Amount advanced (A) = $6000. Payment (P) = $200.
Number of payments (n) = 36.
Unit-period = 1 month. Unit-periods per year (w) = 12.
Advance, 2-10-78. First payment, 4-1-78.
From 3-1-78 through 4-1-78 = 1 unit-period. (t = 1)
From 2-10-78 through 3-1-78 = 19 days. (f = 19/30 )
Annual percentage rate (I) = wi = .1182 = 11.82%

Example (iii): Semimonthly payments (short first period)

Amount advanced (A) = $5000. Payment (P) = $219.17.
Number of payments (n) = 24.
Unit-period = 1/2 month. Unit-periods per year (w) = 24.
Advance, 2-23-78. First payment, 3-1-78. Payments made
on 1st and 16th of each month.
From 2-23-78 through 3-1-78 = 6 days. (t = 0; f = 6/15 )
Annual percentage rate (I) = wi = .1034 = 10.34 %

Example (iv): Quarterly payments (long first period)

Amount advanced (A) = $10,000. Payment (P) = $385.
Number of payments (n) = 40.
Unit-period = 3 months. Unit-periods per year (w) = 4.
Advance, 5-23-78. First payment, 10-1-78.
From 7-1-78 through 10-1-78 = 1 unit-period. (t = 1)
From 6-1-78 through 7-1-78 = 1 month = 30 days. From
5-23-78 through 6-1-78 = 9 days. (f = 39/90 )
Annual percentage rate (I) = wi = .0897 = 8.97 %

Example (v): Weekly payments (long first period)

Amount advanced (A) = $500. Payment (P) = $17.60.
Number of payments (n) = 30.
Unit-period = 1 week. Unit-periods per year (w) = 52.
Advance, 3-20-78. First payment, 4-21-78.
From 3-24-78 through 4-21-78 = 4 unit-periods. (t = 4)

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

From 3-20-78 through 3-24-78 = 4 days. (f = 4/7 )
Annual percentage rate (I) = wi = .1496 = 14.96 %

(2) <u>Single advance transaction, with an odd first payment, with or without an odd first period, and otherwise regular.</u> The general equation in paragraph (b)(8) of this section can be put in the following special form for this type of transaction:

$$A = 1/(1+fi)(1+i)^t[P_1 + P ?sym?/(1+i)]$$

<u>Example (i)</u>: Monthly payments (regular first period and irregular first payment)

Amount advanced (A) = $5000. First payment ($P_1$) = $250.
Regular payment (P) = $230. Number of payments (n) = 24.
Unit-period = 1 month. Unit-periods per year (w) = 12.
Advance, 1-10-78. First payment, 2-10-78.
From 1-10-78 through 2-10-78 = 1 unit-period. (t = 1; f = 0)
Annual percentage rate (I) = wi = .1008 = 10.08%

<u>Example (ii)</u>: Payments every 4 weeks (long first period and irregular first payment)

Amount advanced (A) = $400. First payment ($P_1$) = $39.50.
Regular payment (P) = $38.31. Number of payments (n) = 12.
Unit-period = 4 weeks. Unit-periods per year (w) = 5 2/4 = 13.
Advance, 3-18-78. First payment, 4-20-78.
From 3-23-78 through 4-20-78 = 1 unit-period. (t = 1)
From 3-18-78 through 3-23-78 = 5 days. (f = 5/28 )
Annual percentage rate (I) = wi = .2850 = 28.50%

(3) <u>Single advance transaction, with an odd final payment, with or without an odd first period, and otherwise regular.</u> The general equation in paragraph (b)(8) of this section can be put in the following special form for this type of transaction:

$$A = 1/(1+fi)(1+i)^t[P ?sym? + Pn/(1+i)^{(n-1)}]$$

<u>Example (i)</u>: Monthly payments (regular first period and irregular final payment)

Amount advanced (A) = $5000. Regular payment (P) = $230.
Final payment ($P_n$) = $280. Number of payments (n) = 24.
Unit-period = 1 month. Unit-periods per year (w) = 12.
Advance, 1-10-78. First payment, 2-10-78.
From 1-10-78 through 2-10-78 = 1 unit-period. (t = 1; f = 0)
Annual percentage rate (I) = wi = .1050 = 10.50%

<u>Example (ii)</u>: Payments every 2 weeks (short first period and irregular final payment)

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

> Amount advanced (A) = $200. Regular payment (P) = $9.50.
> Final payment ($P_n$) = $30. Number of payments (n) = 20.
> Unit-period = 2 weeks. Unit-periods per year (w) = 5 2/2 = 26.
> Advance, 4-3-78. First payment, 4-11-78.
> From 4-3-78 through 4-11-78 = 8 days. (t = 0; f = 8/14 )
> Annual percentage rate (I) = wi = .1222 = 12.22%

(4) _Single advance transaction, with an odd first payment, odd final payment, with or without an odd first period, and otherwise regular._ The general equation in paragraph (b)(8) of this section can be put in the following special form for this type of transaction:

$$A = 1/(1+fi)(1+i)^t[P_1 + P\text{?sym?}/(1+i) + P_n/(1+i)^{(n-1)}]$$

_Example (i):_ Monthly payments (regular first period, irregular first payment, and irregular final payment)

> Amount advanced (A) = $5000. First payment ($P_1$) = $250.
> Regular payment (P) = $230. Final payment ($P_n$) = $280.
> Number of payments (n) = 24. Unit-period = 1 month.
> Unit-periods per year (w) = 12.
> Advance, 1-10-78. First payment, 2-10-78.
> From 1-10-78 through 2-10-78 = 1 unit-period. (t = 1; f = 0)
> Annual percentage rate (I) = wi = .1090 = 10.90%

_Example (ii):_ Payments every two months (short first period, irregular first payment, and irregular final payment)

> Amount advanced (A) = $8000. First payment ($P_1$) = $449.36.
> Regular payment (P) = $465. Final payment ($P_n$) = $200.
> Number of payments (n) = 20. Unit-period = 2 months.
> Unit-periods per year (w) = 1 2/2 = 6.
> Advance, 1-10-78. First payment, 3-1-78.
> From 2-1-78 through 3-1-78 = 1 month. From 1-10-78 through 2-1-78 = 22 days. (t = 0; f = 52/60 )
> Annual percentage rate (I) = wi = .0730 = 7.30%

(5) _Single advance, single payment transaction._ The general equation in paragraph (b)(8) of this section can be put in the special forms below for single advance, single payment transactions. Forms 1 through 3 are for the direct determination of the annual percentage rate under special conditions. Form 4 requires the use of the iteration procedure of paragraph (b)(9) of this section and can be used for all single advance, single payment transactions regardless of term.

Form 1 - Term less than 1 year:

$$I = 100w(P/A - 1)$$

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Form 2 - Term more than 1 year but less than 2 years:

$$I = 50/f \{\{[(1 + f)^2 + 4f(P/A - 1)]^{1/2} - (1 + f)\}$$

Form 3 - Term equal to exactly a year or exact multiple of a year:

$$I = 100[(P/A)^{1/t} - 1]$$

Form 4 - Special form for iteration procedure (no restriction on term):

$$A = P/(1 + fi)(1 + i)^t$$

Example (i): Single advance, single payment (term of less than 1 year, measured in days)

Amount advanced (A) = $1000. Payment (P) = $1080.
Unit-period = 255 days. Unit-periods per year (w) = 3 65/255.
Advance, 1-3-78. Payment, 9-15-78.
From 1-3-78 through 9-15-78 = 255 days. (t = 1; f = 0)
Annual percentage rate (I) = wi = .1145 = 11.45%. (Use Form 1 or 4.)

Example (ii): Single advance, single payment (term of less than 1 year, measured in exact calendar months)

Amount advanced (A) = $1000. Payment (P) = $1044.
Unit-period = 6 months. Unit-periods per year (w) = 2.
Advance, 7-15-78. Payment, 1-15-79.
From 7-15-78 through 1-15-79 = 6 mos. (t = 1; f = 0)
Annual percentage rate (I) = wi = .0880 = 8.80%. (Use Form 1 or 4.)

Example (iii): Single advance, single payment (term of more than 1 year but less than 2 years, fraction measured in exact months)

Amount advanced (A) = $1000. Payment (P) = $1135.19.
Unit-period = 1 year. Unit-periods per year (w) = 1.
Advance, 7-17-78. Payment, 1-17-80.
From 1-17-79 through 1-17-80 = 1 unit-period. (t = 1)
From 7-17-78 through 1-17-79 = 6 mos. (f = 6/12 )
Annual percentage rate (I) = wi = .0876 = 8.76%. (Use Form 2 or 4.)

Example (iv): Single advance, single payment (term of exactly 2 years)

Amount advanced (A) = $1000. Payment (P) = $1240.
Unit-period = 1 year. Unit-periods per year (w) = 1.
Advance, 1-3-78. Payment, 1-3-80.
From 1-3-78 through 1-3-79 = 1 unit-period. (t = 2; f = 0)
Annual percentage rate (I) = wi = .1136 = 11.36%. (Use Form 3 or 4.)

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

(6) Complex single advance transaction.

Example (i): Skipped payment loan (payments every 4 weeks)

A loan of $2135 is advanced on 1-25-78. It is to be repaid by 24 payments of $100 each. Payments are due every 4 weeks beginning 2-20-78. However, in those months in which 2 payments would be due, only the first of the 2 payments is made and the following payment is delayed by 2 weeks to place it in the next month.

Unit-period = 4 weeks. Unit-periods per year (w) = 5 2/4 = 13.

First series of payments begins 26 days after 1-25-78. ($t_1 = 0$; $f_1 = 26/28$ )

Second series of payments begins 9 unit-periods plus 2 weeks after start of first series. ($t_2 = 10$; $f_2 = 12/28$ )

Third series of payments begins 6 unit-periods plus 2 weeks after start of second series. ($t_3 = 16$; $f_3 = 26/28$ )

Last series of payments begins 6 unit-periods plus 2 weeks after start of third series. ($t_4 = 23$; $f_4 = 12/28$ )

The general equation in paragraph (b)(8) of this section can be written in the special form:

$$2135 = 100 \text{ ?sym? } /(1+( 26/28 )i) + 100 \text{ ?sym? } /(1+( 12/28 )i)(1+i)^{10} + 100 <a..>_6/(1+( 26/28 )i)(1+i)^{16} + 100 \text{ ?sym? } /(1+( 12/28 )i)(1+i)^{23}$$

Annual percentage rate (I) = wi = .1200 = 12.00%

Example (ii): Skipped payment loan plus single payments

A loan of $7350 on 3-3-78 is to be repaid by 3 monthly payments of $1000 each beginning 9-15-78, plus a single payment of $2000 on 3-15-79, plus 3 more monthly payments of $750 each beginning 9-15-79, plus a final payment of $1000 on 2-1-80.

Unit-period = 1 month. Unit-periods per year (w) = 12.

First series of payments begins 6 unit-periods plus 12 days after 3-3-78. ($t_1 = 6$; $f_1 = 12/30$ )

Second series of payments (single payment) occurs 12 unit-periods plus 12 days after 3-3-78. ($t_2 = 12$; $f_2 = 12/30$ )

Third series of payments begins 18 unit-periods plus 12 days after 3-3-78. ($t_3 = 18$; $f_3 = 12/30$ )

Final payment occurs 22 unit-periods plus 29 days after 3-3-78. ($t_4 = 22$; $f_4 = 29/30$ )

The general equation in paragraph (b)(8) of this section can be written in the special form:

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

$7350 = 1000$ ?sym? $/(1+( 12/30 )i)(1+i)^6 + 2000/(1+( 12/30 )i)(1+i)^{12} + 750$ ?sym? $/(1+( 12/30 )i)(1+i)^{18} + 1000/(1+( 29/30 )i)(1+i)^{22}$

Annual percentage rate $(I) = wi = .1022 = 10.22\%$

Example (iii): Mortgage with varying payments

A loan of $39,688.56 (net) on 4-10-78 is to be repaid by 360 monthly payments beginning 6-1-78. Payments are the same for 12 months at a time as follows:

| Year | Monthly payment | Year | Monthly payment | Year | Monthly payment |
|------|-----------------|------|-----------------|------|-----------------|
| 1 | $291.81 | 11 | $385.76 | 21 | $380.43 |
| 2 | 300.18 | 12 | 385.42 | 22 | 379.60 |
| 3 | 308.78 | 13 | 385.03 | 23 | 378.68 |
| 4 | 317.61 | 14 | 384.62 | 24 | 377.69 |
| 5 | 326.65 | 15 | 384.17 | 25 | 376.60 |
| 6 | 335.92 | 16 | 383.67 | 26 | 375.42 |
| 7 | 345.42 | 17 | 383.13 | 27 | 374.13 |
| 8 | 355.15 | 18 | 382.54 | 28 | 372.72 |
| 9 | 365.12 | 19 | 381.90 | 29 | 371.18 |
| 10 | 375.33 | 20 | 381.20 | 30 | 369.50 |

Unit-period = 1 month. Unit-periods per year (w) = 12.
From 5-1-78 through 6-1-78 = 1 unit-period. (t = 1)
From 4-10-78 through 5-1-78 = 21 days. (f = 21/30 )
The general equation in paragraph (b)(8) of this section can be written in the special form:
$39,688.56 =$ ?sym? $/(1+( 21/30 )i)(1+i) [291.81 + 300.18/(1+i)^{12} + 308.78/(1+i)^{24} + \ldots\ldots + 369.50/(1+i)^{348}]$
Annual percentage rate $(I) = wi = .0980 = 9.80\%$

(7) Multiple advance transactions.
Example (i): Construction loan

Three advances of $20,000 each are made on 4-10-79, 6-12-79, and 9-18-79. Repayment is by 240 monthly payments of $612.36 each beginning 12-10-79.
Unit-period = 1 month. Unit-periods per year (w) = 12.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

From 4-10-79 through 6-12-79 = (2+ 2/30 ) unit-periods.
From 4-10-79 through 9-18-79 = (5+ 8/30 ) unit-periods.
From 4-10-79 through 12-10-79 = (8) unit-periods.
The general equation in paragraph (b)(8) of this section is changed to the single advance mode by treating the 2nd and 3rd advances as negative payments:

$20{,}000 = 612.36\ ?sym?\ /(1+i)^8 - 20{,}000/(1+(\ 2/30\ )i)(1+i)^2 - 20{,}000/(1+(\ 8/30\ )i)(1+i)^5$

Annual percentage rate (I) = wi = .1025 = 10.25%

Example (ii): Student loan

A student loan consists of 8 advances: $1800 on 9-5-78, 9-5-79, 9-5-80, and 9-5-81; plus $1000 on 1-5-79, 1-5-80, 1-5-81, and 1-5-82. The borrower is to make 50 monthly payments of $240 each beginning 7-1-78 (prior to first advance).

Unit-period = 1 month. Unit-periods per year (w) = 12.
Zero point is date of first payment since it precedes first advance.

From 7-1-78 to 9-5-78 = (2 + 4/30 ) unit-periods.
" " " 9-5-79 = (14 + 4/30 ) "
" " " 9-5-80 = (26 + 4/30 ) "
" " " 9-5-81 = (38 + 4/30 ) "
" " " 1-5-79 = (6 + 4/30 ) "
" " " 1-5-80 = (18 + 4/30 ) "
" " " 1-5-81 = (30 + 4/30 ) "
" " " 1-5-82 = (42 + 4/30 ) "

Since the zero point is date of first payment, the general equation in paragraph (b)(8) of this section is written in the single advance form below by treating the first payment as a negative advance and the 8 advances as negative payments:

$-240 = 240\ ?sym?\ /(1+i) - 1800/(1+(\ 4/30\ )i)\ [1/(1+i)^2 + 1/(1+i)^{14} + 1/(1+i)^{26} + 1/(1+i)^{38}] - 1000/(1+(\ 4/30\ )i)$
$[1/(1+i)^6 + 1/(1+i)^{18} + 1/(1+i)^{30} + 1/(1+i)^{42}]$

Annual percentage rate (I) = wi = .3204 = 32.04%

[46 FR 20892, April 7, 1981, as amended at 46 FR 29246, June 1, 1981]

2008; 74 FR 36094, July 22, 2009, unless otherwise noted.

SOURCE: Reg. Z, 46 FR 20892, Apr. 7, 1981; 52 FR 43181, Nov. 9, 1987; 54 FR 13864, April 6, 1989; 56 FR 13754, April 4, 1991; 58 FR 17084, April 1, 1993; 59 FR 40204, Aug. 5, 1994; 73 FR 44599, July 30,

AUTHORITY: 12 U.S.C. 3806; 15 U.S.C. 1604, 1637(c)(5), and 1639(l); Pub.L. 111-24 § 2, 123 Stat. 1734.

12 C. F. R. Pt. 226, App. J, 12 CFR Pt. 226, App. J

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

12 C.F.R. Pt. 226, App. J                                                                 Page 12

Current through October 9, 2009; 74 FR 52373

© 2009 Thomson Reuters
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.